# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF INDIANA
# INDIANAPOLIS DIVISION

| | |
|---|---|
| **GERALD ROWE,** | ) |
|       **Plaintiff,** | ) |
| v. | ) Case no. 1:20-cv-1373-RLY-MJD |
| **CITY OF INDIANAPOLIS,** | ) |
| **INDIANAPOLIS METROPOLITAN POLICE** | ) |
| **DEPARTMENT,** | ) |
| **MARION COUNTY, and** | ) |
| **MARION COUNTY SHERIFF'S OFFICE,** | ) |
| | ) **Request for jury trial.** |
|       **Defendants.** | ) |

## FIRST AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

Plaintiff, Gerald "Jerry" Rowe, by counsel, alleges as follows against Defendants:

## INTRODUCTION

1.  On May 27, 2018, after being threatened by his roommate, Mr. Rowe, a deaf individual, called 911 for assistance using a video relay interpretive service on his cell phone. Dispatch relayed to the responding officers that the caller, Mr. Rowe, is deaf and at least one of the responding Indianapolis Metropolitan Police Department (IMPD) officers had previously been to this residence and was, or should have been, on notice that Mr. Rowe communicates using American Sign Language (ASL). Despite this advanced notice, the responding IMPD officers failed to provide a qualified sign language interpreter or any auxiliary aids in order to accommodate and effectively communicate with Mr. Rowe. Rather, the officers primarily communicated with a hearing witness, who was not present during the underlying incident, and Mr. Rowe's roommates to determine what had happened. Mr. Rowe was not given an opportunity

to explain why he had called the police or communicate with the responding officers about his fears and concerns. Instead, Mr. Rowe was arrested and subsequently incarcerated within the Marion County Jail for four days without ever having access to an ASL interpreter or any auxiliary aids to ensure effective communication. Mr. Rowe brings this complaint against the Indianapolis Metropolitan Police Department, the Marion County Sheriff's Office, and Marion County for violations of his civil rights under Title II of the Americans with Disabilities Act, Section 504 of the Rehabilitation Act, and Indiana state law.

## PARTIES

2. Plaintiff Jerry Rowe is a resident of Marion County, Indiana, and is a qualified individual with a disability within the meaning of Title II of the Americans with Disabilities Act of 1990, 42 U.S.C. § 12133 ("ADA") and Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794a ("Section 504").

3. Defendant City of Indianapolis, is a municipal entity located in Marion County, Indiana and is responsible for operating of the Indianapolis Metropolitan Police Department and is a public entity within the meaning of the ADA, 42 U.S.C. § 12131(1), 28 C.F.R. § 35.104, and is subject to Title II of the ADA and its implementing regulations.

4. Defendant City of Indianapolis is a recipient of federal funding within the meaning of Section 504, 29 U.S.C. § 794; 28 C.F.R. 42.540(e)-(f), and operates services, programs, or activities, through its agencies and departments, including the IMPD, within the meaning of Title II of the ADA and Section 504 of the Rehabilitation Act.

5. Defendant Indianapolis Metropolitan Police Department ("IMPD") was at all relevant times the responding law enforcement entity at issue. IMPD is a public entity within the

meaning of the ADA, 42 U.S.C. § 12131(1), 28 C.F.R. § 35.104, and is subject to Title II of the ADA and its implementing regulations.

6. Defendant IMPD is a recipient of federal funding within the meaning of Section 504, 29 U.S.C. § 794; 28 C.F.R. 42.540(e)-(f), and operates services, programs, or activities within the meaning of Title II of the ADA and Section 504 of the Rehabilitation Act.

7. Defendant Marion County Sheriff's Office ("MCSO"), at all relevant times, was responsible for operating the Marion County Jail and is a municipal entity within the meaning of the ADA, 42 U.S.C. § 12131(1), 28 C.F.R. § 35.104, and is subject to Title II of the ADA and its implementing regulations.

8. Defendant MCSO is a recipient of federal funding within the meaning of Section 504, 29 U.S.C. § 794; 28 C.F.R. 42.540(e)-(f), and operates services, programs, or activities within the meaning of Title II of the ADA and Section 504 of the Rehabilitation Act.

9. Defendant Marion County, is a governmental entity located in the State of Indiana and designates operations and tasks to the Marion County Sheriff's Office, is a public entity within the meaning of the ADA, 42 U.S.C. § 12131(1), 28 C.F.R. § 35.104, and is subject to Title II of the ADA and its implementing regulations.

10. Defendant Marion County is a recipient of federal funding within the meaning of Section 504, 29 U.S.C. § 794; 28 C.F.R. 42.540(e)-(f), and operates services, programs, or activities, through its agencies and departments, including the operation of the Marion County Sheriff's Office, within the meaning of Title II of the ADA and Section 504 of the Rehabilitation Act.

## JURISDICTION AND VENUE

11. This Court has subject matter jurisdiction over this action under 28 U.S.C. §§ 1331 and 1343. The Court has supplemental jurisdiction over Mr. Rowe's state law claims under 28 U.S.C. § 1367 and principles of ancillary jurisdiction.

12. Defendants are located within this District, and the events giving rise to the claims identified within this complaint substantially occurred in this District. Pursuant to 28 U.S.C. § 1391(b), this Court is the proper venue.

## FACTUAL ALLEGATIONS

13. On May 27, 2018, at approximately 4:24 a.m., IMPD officers Gerke (ID 40824), B. Fender, and C. Egan responded to a disturbance at 420 N. Kealing Ave., Indianapolis, Indiana.

14. Mr. Rowe, a resident of 420 N. Kealing Ave., had called 911 that morning through a video remote interpreting service (VRS) as he felt threatened by his roommate.

15. VRS is a video telecommunication service that allows deaf individuals to communicate over video telephones and similar technologies with hearing people in real-time, via a sign language interpreter.

16. Mr. Rowe called 911 after he and his roommate, Kenya Mattingly, had been in an argument. Ms. Mattingly hit Mr. Rowe with the television remote and Mr. Rowe took it back from her so that she could not hit him again.

17. Upon information and belief, the officers were on notice of Mr. Rowe's need for a qualified sign language interpreter as dispatch reported to the responding officers that the caller, Mr. Rowe, "was hearing impaired and required a sign language interpreter."

18. After calling 911, Mr. Rowe waited on the front porch of his home. When the police car arrived, Mr. Rowe waved the officers over to his home and went down to the street to meet them. He then walked back up to the house with the officers.

19. A woman, believed to be Dawn Jackson, came out of Mr. Rowe's house pushing him several feet back, as witnessed by the responding officer and captured on the home's Ring video recording.

20. Ms. Jackson is hearing and was able to communicate verbally with the officers.

21. Ms. Jackson did not live with Mr. Rowe or his roommates and was not present for the underlying argument that lead to 911 being called.

22. While Ms. Jackson was giving a statement, Mr. Rowe tried to get the officers' attention.

23. The Ring security camera recording captured one of the police officers stating, "I know you're deaf but can you understand this?" The officer continues to look at Mr. Rowe and hold his finger up and tell him "shhh." The officer that told Mr. Rowe to "shhh" then approaches the porch to instead speak with Ms. Jackson.

24. An officer asks Ms. Jackson why Mr. Rowe was asking his roommates to leave and states to Ms. Jackson that he has been called to this home numerous times before, which he feels is ridiculous. Mr. Rowe can then be heard in the background trying to communicate with the officer and shows the officer his cell phone so he can provide a statement. The officer turns around and again signals and tells Mr. Rowe to "shhh."

25. Ms. Jackson is then heard laughing with the officers and stating that she doesn't know Mr. Rowe and she had only met him in person for the first time that night. The officer then says to Ms. Jackson, while standing several feet from Mr. Rowe, that "he is obviously not all there."

26. Officer Gerke's incident report concerning Mr. Rowe's arrest states that Mr. Rowe was agitated when the officers arrived. In his incident report, Officer Gerke references that Mr.

Rowe attempted to communicate with the officers by use of a cell phone and that Mr. Rowe told the officers that his roommates, Kenya Mattingly and James Thompson, had hired gangsters to threaten him and would not let him into his residence.

27. While Officr Gerke allowed Mr. Rowe to provide some limited information to him through notes on his cell phone, neither Officer Gerke nor any of the other responding officers responded effectively to Mr. Rowe through written communication or through Mr. Rowe's cell phone.

28. The officers ignored Mr. Rowe's request to communicate and at no time during this interaction did the IMPD officers request a sign language interpreter or effectively communicate with Mr. Rowe.

29. Upon information and belief, the IMPD officers failed to obtain additional information as to why Mr. Rowe had called 911 for assistance or why he was agitated.

30. The IMPD report states that Ms. Mattingly contended that Mr. Rowe had grabbed her by her shoulders, and had bent the fingers of her right hand in order to take a remote from her.

31. Further, upon information and belief, the IMPD officers also obtained information from Ms. Mattingly's boyfriend who has a cochlear implant and is able to communicate verbally.

32. While the IMPD report states that Mr. Rowe admitted to taking the remote from Ms. Mattingly, it omits that Mr. Rowe took the remote from her because she had hit him with it and he was trying to prevent her from hitting him again.

33. The officers read the notes that Mr. Rowe typed on his cell phone but they did not provide any meaningful response or ask him any questions about the underlying interaction. The officer simply typed to Mr. Rowe that he was being placed under arrest for allegedly grabbing Ms. Mattingly's finger.

34. Instead, the officers obtained a statement from Ms. Jackson, a hearing individual who does not live in the home and was not present for the alleged underlying incident, yet repeatedly refused to communicate with Mr. Rowe.

35. The responding IMPD officers arrested Mr. Rowe and transported him to the Marion County Jail.

36. The arresting officers handcuffed Mr. Rowe behind his back which prevented him from being able to use his hands to sign or communicate in anyway.

### Incarceration within the Marion County Jail

37. Mr. Rowe was transported to the Marion County Jail.

38. The Marion County Jail is operated by the Marion County Sheriff's Office.

39. Upon information and belief, the IMPD officers transporting Mr. Rowe to the Marion County Sheriff's Jail failed to contact Marion County Sheriff's Office to request an ASL interpreter or any other appropriate auxiliary aid to communicate with Mr. Rowe.

40. Upon arriving at the jail, Mr. Rowe remained handcuffed behind his back which prevented his ability to sign.

41. Once his handcuffs were removed, Mr. Rowe repeatedly tried to gesture and sign to jail staff that he is deaf and needed an ASL interpreter to communicate.

42. As Mr. Rowe's repeated requests for an ASL interpreter were ignored, he attempted to follow what the other inmates were doing as he had no way to understand the officers' instructions.

43. During the booking process into the jail, Mr. Rowe was finger printed and had his mugshot taken. Defendants failed to provide him with a qualified sign language interpreter during this process and Mr. Rowe was unable to understand the correctional staff.

44. The officers used gestures to try and instruct Mr. Rowe as to what he was required to do; for example, they mimicked undressing when Mr. Rowe was required to change out of his clothes and into a jail issued jumpsuit.

45. Mr. Rowe was detained in the Marion County Jail from May 27, 2018, until May 30, 2018, without ever having the charges against him explained or any information as to how or when he might be released or appear in court.

46. Mr. Rowe was detained without having the rules and procedures of the jail explained to him or any explanation as to how he might access services available within the jail – such as access to a telephone, recreational or religious activities, or equal access to medical care as hearing offenders.

47. Mr. Rowe did not understand the jail rules and procedures. In addition to signing for an ASL interpreter, he also requested, but was denied, a pencil and paper by gesturing as if he were writing on his hand.

48. Jail staff removed his phone, wallet, belt, and all other possessions without explaining why or any other processes.

49. While Mr. Rowe was having his fingerprints taken, a nurse attempted to finger spell with Mr. Rowe.

50. However, when Mr. Rowe responded using rudimentary, simple signs, the nurse could not understand or communicate with him.

51. Both custody and medical staff refused to provide Mr. Rowe with a qualified sign language interpreter or any appropriate auxiliary aid.

52. Without a qualified sign language interpreter or any other appropriate auxiliary aid, Mr. Rowe was unable to effectively communicate while in custody with jail personnel and medical

staff, and he did not have meaningful access to the services or information available to an inmate who is hearing.

53. During his time in Marion County Jail, several officers attempted to communicate with Mr. Rowe by speaking. Mr. Rowe could not understand them.

54. Upon information and belief, these officers expected Mr. Rowe to read their lips.

55. Mr. Rowe has a very limited ability to read lips.

56. Lip reading is not an effective form of communication for Mr. Rowe.

57. Staff refused to allow Mr. Rowe to keep paper or a writing utensil with him so he was prevented from even exchanging written notes for the majority of his incarceration.

58. Being incarcerated without any way to communicate was stressful and confusing for Mr. Rowe. He did not understand what was expected of him or where he was going when transported within the jail. Further, officers shook their heads and mouthed "no" when Mr. Rowe tried to sign and gesture.

59. Medical staff failed to provide Mr. Rowe with a qualified ASL interpreter or auxiliary aids when they attempted to ask him medical intake questions.

60. Without an ASL interpreter or any other auxiliary aid, Mr. Rowe was unable to understand what was being asked and was unable to provide staff with his medical information.

61. Mr. Rowe takes over-the-counter medication on a daily basis to manage pain from a preexisting knee injury. He attempted to request ibuprofen, or comparable over-the-counter medication, by gesturing that his knee hurt and mimicked taking a drink and swallowing a pill. However, without any method of effective communication, his request was ignored and he experienced continuous pains in his knee during his incarceration.

62. On May 27, after arriving at the jail, Mr. Rowe felt lethargic and stressed. He fell on the floor and was transported to Eskenazi Health for emergency medical treatment.

63. While being treated at Eskenazi Health, Mr. Rowe was administered 500 mg of naproxen for the pains in his leg. This was the only pain reliever that he received during his four-day incarceration.

64. Mr. Rowe was embarrassed by falling or passing out and was frustrated because he was unable to explain or express his physical pain and emotional stress to the jail personnel and medical staff.

65. While Mr. Rowe was having his mugshot taken, the officers became upset with him. He attempted to follow instructions but without an ASL interpreter, the officers were unable to effectively communicate the instructions. The officers were hostile to Mr. Rowe and used angry facial expressions when he failed to follow or understand their directions.

66. Mr. Rowe then became frustrated with the process and began excitedly signing that he needed an interpreter. He repeated the sign for an ALS interpreter numerous times and slammed on the table.

67. The officers present then slammed Mr. Rowe against a wall and pushed him down.

68. Mr. Rowe recalls seeing an officer reach for a taser – in response Mr. Rowe signed and gestured that he was good and would be calm. Mr. Rowe was then placed in an isolated cell that he refers to as a "punishment hole."

69. Mr. Rowe was placed in this isolated cell without knowing how long he would be there, how he could communicate or seek help, or what would happen next.

70. Mr. Rowe recalls an officer coming to his cell with a pencil and paper and they exchanged written notes through the cuff port.

71. Mr. Rowe asked for an interpreter in writing. He also asked when he could go to court and requested a TTY or videophone.

72. The officer acknowledged his notes but did not respond, did not provide access to a qualified ASL interpreter, the TTY or a videophone.

73. Mr. Rowe again became frustrated and confused while isolated in his cell. When he would see an officer walk by, he would knock on the door and wave to try and get his or her attention. He also continued to tap or bang on the door every five to ten minutes. His efforts were ignored by the officers.

74. At some point, Mr. Rowe was transferred from this cell to a medical unit with other inmates.

75. Mr. Rowe was not provided with any method of effective communication until on or about May 30, 2018, when a man he believes to be the chaplain visited him.

76. At this time, Mr. Rowe was able to exchange written notes and he stated to the chaplain that he needed to be able to use the TTY or a video phone.

77. Mr. Rowe asked the chaplain to find the phone number for Deaf Community Services, which he did, and Mr. Rowe was then taken to use a TTY.

78. This was the only agency Mr. Rowe could think of that would be able to accept a call from a TTY, as it is outdated technology.

79. Mr. Rowe was able to contact Deaf Community Services and tell them he had been arrested. He asked for their assistance and support as he had not been able to communicate with Defendants' staff during his incarceration, and he did not understand why he was still in jail.

80. Marion County Jail Division Policy # JP5-8 requires that new inmates shall be allowed to complete a telephone call during the admission process and that assistance shall be available to inmates when necessary.

81. Despite Policy # JP5-8, upon information and belief, Mr. Rowe was not provided access to the jail's TTY until he contacted Deaf Community Services on May 30, 2018.

82. As a deaf individual, without a qualified ASL interpreter or appropriate auxiliary aids or services, Mr. Rowe was unable to effectively communicate while in custody of the Marion County Sheriff's Office. He was unable to communicate his medical need forcing him to experience physical pain; he had no understanding of why he had been arrested; he did not know for how long he would remain in jail; he was slammed the wall by staff and placed in solitary confinement for attempting to communicate via ASL; and for four days he was unable to place a phone call to ask for any assistance, legal or otherwise.

83. Defendants' failure to provide Mr. Rowe with an ASL interpreter or any other auxiliary aid or service caused Mr. Rowe to experience stress, trauma, and confusion during the entire four days we was held in jail.

**Court Hearing in Marion County Superior Court 12**

84. Upon information and belief, when Mr. Rowe was transferred from the jail to Marion County Superior Court 12, jail staff failed to inform the courtroom staff that they were transporting a Deaf inmate and that Mr. Rowe required an ASL interpreter.

85. When he arrived at court, Mr. Rowe gestured to a staff person that he is deaf by pointing to his ear and gesturing with signs.

86. This staff person approached Mr. Rowe and handed him a note that stated they were sorry and that they would schedule an interpreter.

87. Mr. Rowe remained seated in the courtroom with the other inmates that had been transported with him. Since jail staff failed to communicate with the court and an interpreter was not scheduled prior to his hearing, unlike the other hearing inmates, Mr. Rowe was unable to understand the court proceedings taking place.

88. After an interpreter arrived, Mr. Rowe appeared before the Judge. He pleaded not guilty and was then transported back to the jail where he was released from custody later that day.

89. Mr. Rowe was charged with battery resulting in bodily injury, a class A misdemeanor, in cause no. 49G12-1805-CM-016967. On October 10, 2018, the State, through a motion to dismiss, declined to prosecute this action and the case was dismissed in its entirety.

## Continued Discriminatory Practice by IMPD

90. Defendants City of Indianapolis and IMPD continues the discriminatory practice of failing to provide an ASL interpreter or auxiliary aids when necessary to facilitate effective communication with a deaf individual in need of police assistance.

91. On or about December 22, 2019, Mr. Rowe called 911 for assistance.

92. Mr. Rowe requested an ASL interpreter when he used his video relay phone to call 911.

93. When Officer Newlin arrived, he was not accompanied by an interpreter.

94. Mr. Rowe wrote notes to Officer Newlin and asked for the Officer's cell phone number so that Mr. Rowe could call him using his video relay service and explain what had happened with the assistance of an ASL interpreter.

95. Mr. Rowe's request was denied and instead Officer Newlin attempted to exchange written notes with Mr. Rowe.

96. Written communication is not an effective method of communication for Mr. Rowe.

## CAUSES OF ACTION

### COUNT I
### AMERICANS WITH DISABILITIES ACT AGAINST
### DEFENDANTS CITY OF INDIANAPOLIS AND IMPD

97. Mr. Rowe is deaf and is a qualified individual with a disability within the meaning of Title II of the Americans with Disabilities Act of 1990, 42 U.S.C. § 12133.

98. Defendant City of Indianapolis is a local government entity or other instrumentality of a local government. Accordingly, the City of Indianapolis is public entity as defined in 42 U.S.C. § 12131(1).

99. Title II of the ADA, 42 U.S.C. § 12132, applies to local governmental entities, such as the City of Indianapolis and the Indianapolis Metropolitan Police Department (IMPD), and provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."

100. Title II of the ADA prohibits the City of Indianapolis and IMPD from discriminating against a qualified individual with a disability, such as Mr. Rowe, by denying him the benefit and service afforded to individuals without a disability.

101. By policy, practice, procedure, and through their employees, based on the facts above, Defendant City of Indianapolis, through the IMPD, discriminated against Mr. Rowe on the basis of and because of his disability by denying him the benefits, programs, and services afforded to hearing individuals.

102. Defendants City of Indianapolis and IMPD have discriminated intentionally against Mr. Rowe in violation of Title II of the ADA, 42 U.S.C. § 12132, by refusing to provide a qualified ASL interpreter or auxiliary aids and services necessary to ensure effective communication.

## COUNT II
## REHABILITATION ACT AGAINST
## DEFENDANTS CITY OF INDIANAPOLIS AND IMPD

103. Mr. Rowe is deaf and is a qualified individual with a disability within the meaning of Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 ("Section 504").

104. Defendants City of Indianapolis and IMPD are recipients of federal financial assistance.

105. Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, provides that no qualified individual with a disability, solely by the reason of his disability, may "be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."

106. Defendants City of Indianapolis and IMPD, through its employees, has discriminated intentionally against Mr. Rowe by refusing to provide a qualified ASL interpreter or auxiliary aids and services necessary to ensure effective communication and an equal opportunity for Mr. Rowe to participate in Defendants' programs in violation of Section 504 of the Rehabilitation Act, 29 U.S.C. § 794.

## COUNT III
## AMERICANS WITH DISABILITIES ACT AGAINST DEFENDANTS MARION
## COUNTY AND THE MARION COUNTY SHERIFF'S OFFICE

107. Mr. Rowe is deaf and is a qualified individual with a disability within the meaning of Title II of the Americans with Disabilities Act of 1990, 42 U.S.C. § 12133.

108. Defendants Marion County and the Marion County Sheriff's Office (MCSO) are local government entities or other instrumentalities of a local government. Accordingly, Marion County and the MCSO are public entities as defined in 42 U.S.C. § 12131(1).

109. Title II of the ADA, 42 U.S.C. § 12132, applies to local governmental entities, such as Marion County and the MCSO, and provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."

110. Title II of the ADA prohibits Marion County, through the MCSO, from discriminating against a qualified individual with a disability, such as Mr. Rowe, by denying him the benefit and service afforded to individuals without a disability.

111. By policy, practice, procedure, and through their employees, based on the facts above, Defendants Marion County and the MCSO discriminated against Mr. Rowe on the basis of and because of his disability by denying him the benefits, programs, and services afforded to hearing individuals.

112. Defendants Marion County and the MCSO have discriminated intentionally against Mr. Rowe in violation of Title II of the ADA, 42 U.S.C. § 12132, by refusing to provide a qualified ASL interpreter or auxiliary aids and services necessary to ensure effective communication.

## COUNT IV
## REHABILITATION ACT AGAINST DEFENDANT MARION COUNTY AND THE MARION COUNTY SHERIFF'S OFFICE

113. Mr. Rowe is deaf and is a qualified individual with a disability within the meaning of Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 ("Section 504").

114. Defendants Marion County and MCSO are recipients of federal financial assistance.

115. Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, provides that no qualified individual with a disability, solely by the reason of his disability, may "be excluded from the

participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."

116. Defendants Marion County and the MCSO discriminated intentionally against Mr. Rowe by refusing to provide a qualified ASL interpreter or auxiliary aids and services necessary to ensure effective communication and an equal opportunity for Mr. Rowe to participate in Defendant's programs in violation of Section 504 of the Rehabilitation Act, 29 U.S.C. § 794.

## COUNT V
## STATE TORT CLAIMS
## AGAINST DEFENDANTS MCSO and MARION COUNTY

117. The actions and inactions of Defendant Marion County and MCSO, through their employees, constitute torts under state law, including but not limited to assault, battery, negligence, and intentional infliction of emotional distress.

118. The acts and omissions were willful, wanton, malicious, and in reckless violation of Mr. Rowe's rights, subjecting him to pain, mental anguish, emotional distress, and other damages and injury.

119. Defendant MCSO and Marion County are liable for the torts of its employees who were acting within the scope of employment.

120. Mr. Rowe, by counsel, served a notice of tort claim against the defendants in compliance with Indiana Code section 34-13-3.

## JURY DEMAND

121. Plaintiff requests a trial by jury.

## PRAYER FOR RELIEF

Wherefore, Mr. Rowe respectfully requests that this Court:

A. Declare that Defendants have violated Plaintiff's rights as noted above and enforce injunctive relief as to Defendant Indianapolis Metropolitan Police Department.

B. Award Plaintiff damages, including punitive damages, following a trial by jury.

C. Award Plaintiff costs and reasonable attorneys' fees pursuant to 42 U.S.C. § 1988.

D. All other just and proper relief.

        Respectfully submitted,

*/s/ Nikki G. Gray*
Nikki G. Gray, # 31209-49
Indiana Disability Rights
4701 North Keystone Avenue, Suite 222
Indianapolis, Indiana 46205
(317) 722-3445
NGray@indianadisabilityrights.org